## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SHAWN SHETTERLY, et. al.      )
                                )
           Plaintiffs,      )
                                )
            v.         )  Civil Action   02-862
                                )
SONY ELECTRONICS, INC.,      )
                                )
           Defendant.     )

## **MEMORANDUM OPINION**

<u>Conti</u>, District Judge.

The issue submitted to the court in the two motions for summary judgment filed by defendant Sony Electronics, Inc. ("defendant" or "Sony") is whether plaintiffs Shawn Shetterly ("Shetterly")[1] and Arlyn Buss ("Buss")[2] (collectively "plaintiffs") presented sufficient evidence to create a genuine issue of material fact with respect to whether their fraudulent misrepresentation claims come within an exception to the exclusivity provision of the Pennsylvania Workmen's Compensation Act, 77 P.S. § 481(a).[3] Plaintiffs contend that their

---

[1] Shetterly's wife, Bobbi Jo Shetterly, also filed a derivative loss of consortium claim.

[2] Buss's wife, Judith Fleehr, also filed a derivative loss of consortium claim.

[3] Section 303 of the Pennsylvania Workmen's Compensation Act, which contains what is commonly referred to the "exclusivity provision," provides in relevant part as follows:

> (a) The liability of an employer under this act *shall be exclusive*
> and in place of *any and all other liability* to such employes [sic],
> his legal representative, husband or wife, parents, dependents, next
> of kin, or anyone otherwise entitled to damages in any action at law
> or otherwise on account of any injury or death . . . .

77 P.S. § 481(a) (emphasis added)

claims are actionable under the narrow exception to the exclusivity provision set forth in <u>Martin v. Lancaster Battery Co., Inc.</u>, 606 A.2d 444 (Pa. 1992).  For the reasons set forth below, the court will grant defendant's motion for summary judgment with respect to the claims of Buss and his wife, Judith B. Fleehr, and deny defendant's motion with respect to the claims of Shetterly and his wife, Bobbie Jo Shetterly.

### *Background*

### I.      **Plaintiffs' exposure to lead oxide**

Defendant, a Delaware corporation with its principal place of business in Park Ridge, New Jersey, manufactures televisions at its plant in Mount Pleasant, Pennsylvania (the "plant"). In or around May 1999, defendant unveiled a new glass processing operation at the plant.  Jt. Stip. of Material Facts ("J.S.") (Doc. No. 126) ¶ 1.  The new operation utilizes a Panel Funnel ("PF") Seal Machine, an automated machine that uses high voltage and heat to seal together three pieces of glass (a neck, a panel, and a funnel) into 7 inch "bulbs."  <u>Id</u>. ¶¶ 1-2.  These three glass pieces work in tandem to create the image that is reflected off of a mirror inside the television and onto the television screen.  Pl.'s App. (Doc. No. 112) Ex. A at 21.  Defendant was aware that the glass pieces contained lead, as lead is an element that protects television consumers from the emission of otherwise-harmful x-rays.  Def.'s App. (Doc. No. 99) Ex. A at 11.  Furthermore, defendant was aware that lead oxide was created as a by-product of the PF seal process.  J.S. ¶ 3. In July 1999, Sony began pilot production using the PF Seal Machine; in September 1999, full production began.  <u>Id</u>. ¶ 8.  Shetterly transferred to the new glass processing unit as a glass technician in May 1999, and Buss began working in the glass processing area in September 1999.

2

Id. ¶¶ 8-9.  Plaintiffs were primarily responsible for monitoring the automated equipment,

cleaning and maintaining the equipment, and troubleshooting in the event problems arose.  Id. ¶

10.

Plaintiffs contend that Sony was aware of the existence of unhealthy lead levels in the

processing area prior to receiving elevated blood lead level test results from several technicians

in February-March 2000, yet concealed such information from plaintiffs because of production

problems.  See e.g. Pl.'s App. Ex. C at 100; Ex. D at 123.  Sony engineer/technician Vince

Stabley stated that he observed a powdery substance attached to the burner stations and the

stainless steel back plates for the head rotation assembly in the PF Seal assembly area as early as

June 1999.  Pl.'s App. Ex. B at 22-23.  Stabley further stated that there were numerous

discussions between engineers and technicians in the plant regarding the existence of the lead

powder in June 1999.  Id. at 23-24.[4]  Lead powder manifested itself as a "grayish, white-

yellowish powder" caked on the PF Seal Machine, as well as in the form of an orange-colored

residue inside the bulbs.  Pl.'s App. Ex. D 171-72.  Each of the technicians in the glass

processing area noticed the residue and asked either Stabley or Sony Health and Safety

Administrator Stephen Ramer about it.[5]  Although Stabley contends that technician Wilbert Roth

---

[4]  Despite these discussions, there were no warning signs regarding the presence of lead in
the PF Seal Machine glass processing area.  Pl.'s App. Ex. D at 236.

[5]  Ramer's responsibilities at Sony included assisting with the documentation and
tracking of safety records, focusing on injury-tracking software, and being a resource for the PJ-
CRT division of Sony (which included the glass processing unit).  J.S. ¶¶ 43-44.  Ramer obtained
a degree in safety science from Indiana University of Pennsylvania in 1997, and he began
working for Sony immediately thereafter.  Id. ¶ 40.  Ramer received general educational training
in college regarding the symptoms of lead toxicity, heat exhaustion, and heat stroke.  Pl.'s App.
Ex. P at 85.  Ramer also underwent "self-education" when he dealt with those issues at Sony.  Id.
Ramer stated that he gave formal seminars on the symptoms of lead toxicity while employed at
Sony, and that he discussed informally with employees the symptoms of heat exposure.  Id. at 85-

was aware the residue on the machine was lead oxide in June 1999, Roth stated that he was

unaware it was lead oxide because the residue on the PF Seal Machine looked completely

different from the substance he previously encountered on the Automatic Gun Seal ("AGS")

machine.  Pl.'s Dep. Ex. C at 212, 215.[6]  Furthermore, Roth stated that when he asked Stabley

about the residue in the summer of 1999, Stabley told Roth that he was unsure as to what the

residue was on the machine.  Id. at 212.  Roth and technician Martin Switzer were later told that

the powder was "oxide," but not that it was "lead oxide."  Pl.'s App. Ex. G at 116-17; Pl.'s App.

Ex. C 120-21.  Buss asked Ramer about the substance in October 1999, and was told "don't

worry about it, it won't hurt you."  Pl.'s App. Ex. E at 72-73.

 At around the same time the technicians were asking questions about the nature of the

residue on the machine and on the bulbs, several technicians were also making complaints about

health symptoms they were experiencing while working in the glass processing area.  Switzer

told Ramer and Stabley that he was experiencing muscle cramps, nausea, and a metallic taste in

his mouth.  Pl.'s App. Ex. G at 60-61, 114-15; Pl.'s Supp. Aff. ¶ 5 (Doc. No. 127)  Shetterly also

told Ramer that he was experiencing nausea, leg cramps, cramps, and a metallic taste in his

mouth.  Pl.'s App. Ex. D at 14-15; Pl.'s Supp. Aff. ¶¶ 6-9.[7]  Buss reported having headaches,

---

86.  Ramer indicated that the symptoms of lead toxicity include "a general malaise, tiredness, aching joints, and a metallic taste in the mouth."  Id. at 86.  Ramer stated that heat exhaustion symptoms were similar, but that they did not include a metallic taste in the mouth.  Id.  One of the handouts Ramer gave to employees in connection with training on lead toxicity analogized the amount of lead exposure to trigger the OSHA limit of 40μg/100g as one packet of artificial sweetener dumped into 600 gallons of coffee.  Id. at 120; Dep. Ex. 5.

 [6]  Sony had a similar operation at the plant which utilized an AGS machine to seal lead glass together.  J.S. ¶ 3.

 [7]  Whether Shetterly told Ramer that he had a metallic taste in his mouth is a fact in dispute between the parties.  In his deposition, Shetterly testified that he told Ramer in September

1999: "that I was having headaches and, you know, the nausea and the leg pain and the cramps *and everything*." Pl.'s App. Ex. D at 15 (emphasis added). Shetterly filed a supplemental affidavit on March 21, 2005, in which he stated: "The word 'everything' referred to the metallic taste in my mouth." Pl.'s Sur-Reply Br. Ex. A ¶ 8. Shetterly stated that defendant never asked him what the phrase "and everything" meant, nor did he explain what it meant because of a prior accident that has caused him "permanent deficits in attention, concentration and cognition." Id. ¶ 2. Defendant filed a motion to strike Shetterly's affidavit (Doc. No. 128). Defendant asserts that the affidavit must be stricken by the court because it contradicts Shetterly's earlier deposition testimony. See Hackman v. Valley Fair, 932 F.2d 239, 241 (3d Cir. 1991); Martin v. Merrell Dow Pharmaceuticals, Inc., 851 F.2d 703 (3d Cir. 1988).

Defendant's statement of the applicable law is correct. The court, however, disagrees that plaintiff's supplemental affidavit in this case should be stricken. The supplemental affidavit supplied by the plaintiff in Martin directly contradicted at least eight answers she previously gave in her deposition testimony and in sworn answers to interrogatories regarding the date she began taking the drug at issue in that case. The plaintiff's responses as given would have established that she could not prove that the drug at issue was the proximate cause of her child's birth defects. Id. at 704-05. In response to the defendant's motion for summary judgment, the plaintiff submitted a supplemental affidavit which squarely contradicted her previous statements by placing the date at which she began taking the drug at issue several months earlier than in her previous sworn statements. Id. at 705.

The court of appeals affirmed the district court's order granting the defendant's motion to strike the supplemental affidavit. In its opinion, the court of appeals noted :

> The date of [the plaintiff's] first ingestion of Bendectin, a fact of considerable importance, *was the subject of repeated questioning.* Plaintiff's affidavit, submitted only after she faced almost certain defeat in summary judgment, flatly contradicted no less than eight of her prior sworn statements. . . . Moreover, *no explanation was offered in the affidavit for the contradictions.*

Id. at 705-06 (emphasis added). According to the court of appeals, a subsequent affidavit does not create a genuine issue of material fact where "the affiant was carefully questioned on the issue, had access to the relevant information at that time, and provided no satisfactory explanation for the later contradiction." Id. at 706. Because the plaintiff was thoroughly questioned on the important issue of when she ingested the drug and because she provided no explanation for the contradictory answers she supplied in her affidavit, the court of appeals held that the district court correctly granted the motion to strike the affidavit. The court of appeals did note that, however, that "there are situations in which sworn testimony can properly be corrected by a subsequent affidavit," such as "[w]here the witness was confused at the earlier deposition or for some reason misspoke." Id. at 705.

In the present case, Shetterly was asked one question about which symptoms he told Ramer he was experiencing in September 1999. Shetterly responded by stating he experienced headaches, nausea, leg pain and cramps, "and everything." Pl.'s App. Ex. D at 15. No further questions were asked as to what "and everything" meant, nor was Shetterly asked any questions regarding whether he had a "metallic taste" in his mouth. This is not a situation such as Martin where the plaintiff's supplemental affidavit directly contradicted the plaintiff's clear answer to a

muscle cramps, nausea, and a metallic taste in his mouth.  Pl.'s App. Ex. E at 82-83; Pl.'s Supp.

Aff. ¶¶ 4-5.  When Shetterly told Ramer about his conditions in September 1999, Ramer told him

he was experiencing his conditions because he was not yet acclimated to the heat in the

processing area.  Pl.'s App. Ex. D at 14-15.[8]  Following complaints from Buss about headaches

---

straightforward question.  In fact, plaintiff's statement in his supplemental affidavit that he had a
"metallic taste" in his mouth is supported by the deposition testimony of Dr. Jay Douglas Harper,
who testified that Shetterly told him that "[h]e noted a metallic taste."  Pl.'s Supp. App. (Doc.
No. 133) at 71.

Shetterly further stated in his supplemental affidavit that he may have omitted "metallic
taste" from his list of symptoms because his previous accident impaired his ability to concentrate
when answering questions.  This statement actually supports an answer Shetterly gave to defense
counsel in his deposition.  When defense counsel asked Shetterly whether the drugs he was
taking on the date of his deposition interfered with his ability to understand questions or
concentrate, Shetterly responded: "I'm not really sure."  Def.'s Mot. to Strike (Doc. No. 128) Ex.
A.  Thus, Shetterly's ability to concentrate was placed squarely at issue by defense counsel
during his deposition.  The court therefore agrees with plaintiff that the supplemental affidavit
should not be stricken.  Defendant can certainly utilize plaintiff's deposition testimony and the
subsequent supplemental affidavit to impeach plaintiff Shetterly's testimony at trial.  The jury
will ultimately determine whether Shetterly told Ramer in September 1999 that he had a
"metallic taste" in his mouth.

The court further agrees that paragraphs 4-5 of the supplemental affidavit can be
considered by the court in ruling upon the motion for summary judgment.  The statements fall
under the existing physical condition exception to the hearsay rule encompassed in Federal Rule
of Evidence 803(3).  That rule provides as follows:

A statement of the declarant's *then-existing* state of mind, emotion, sensation, or
physical condition (such as intent, plan, motive feeling, pain, and *bodily health*),
but *not including a statement of memory or belief* to prove the fact remembered or
believed unless it relates to the execution, revocation, identification, or terms of
declarant's will.

Fed.R.Evid. 803(3) (emphasis added).  The rule provides an exception to the hearsay rule for
statements the listener contemporaneously observed the declarant making about the declarant's
bodily health.  Both of the statements offered by plaintiff Shetterly in paragraphs 4-5, which refer
to Shetterly overhearing contemporaneous statements of Buss and Switzer regarding having a
metallic taste in their mouths, fall under Rule 803(3).  Again, defendant is certainly free to
impeach plaintiff Shetterly regarding paragraphs 4-5 at trial.

Accordingly, the court will deny defendant's motion to strike plaintiff's supplemental
affidavit.

[8]  Once production began, the glass process produced heat in excess of 100° Fahrenheit.
J.S. ¶ 12.  Ramer testified in his deposition, however, that if one of the technicians had come to
him complaining of symptoms such as nausea, dizziness, confusion, leg cramps, and sore hands,

and muscles cramps, Sony provided the technicians with "Squencher" drinks upon Buss's request ostensibly to combat the effects of the heat in the processing area. Pl.'s App. Ex. E at 82. Although Buss's headaches dissipated after he began drinking the "Squencher" drinks, his muscle cramps remained. Id.

The technicians cleaned the PF Seal Machine either by using a compressed air hose that produced a dust cloud, or by using a Shop-Vac vacuum cleaner with a funnel. Pl.'s App. Ex. D at 165-168; Pl.'s App. Ex. E at 90-91. Although there were exhaust hoods in the processing area, the hoods were not connected to an active exhaust system until after the positive blood lead level test results came back in March 2000. Pl.'s Ex. I at 25. Each of technicians complained to either Ramer or Sony Glass Technician Taichi Tamura about the dust conditions in the processing area. Pl.'s Ex. C at 220-21; Pl.'s App. Ex. D at 170-71; 232-34; Pl.'s Ex. E at 90-91; Pl.'s Ex. G at 49-50. In response, the technicians were told to use dust masks and to vacuum the area frequently using a funnel that Ramer designed. The cleaning measures used in the processing area, however, were insufficient to prevent a build-up of lead oxide on the PF Seal Machine. As a result, the machine did not work properly causing approximately 80% of the bulbs produced by the machine to break. Pl.'s App. Ex. D at 155. In order to correct this problem, Sony instructed the technicians to clean the machine with the D-lead cleaning product. Id. It was at this time that the technicians first realized that the residue on the machine was lead. Id; Pl.'s App. Ex. C at 173; 211-15. Even after this point, Ramer reassured the technicians in the processing area that

---

he would not have considered them from suffering from heat exposure. Pl.'s App. Ex. P at 94. According to Ramer, the heat levels in the room were not excessive and the metabolic work loads of the technicians were not that strenuous. Id. Ramer did state during his deposition that he remembered telling Roth that his body would become acclimated to the heat over time. Id. at 95. He did not recall discussing with anyone whether plaintiffs were suffering from the symptoms of lead poisoning. Def.'s App. Ex. L at 120.

there was an insufficient amount of lead to harm them.  Pl.'s App. Ex. D at 162.  Ramer did

check with the environmental department to determine where the technicians could clean the lead

oxide from the hoods on the PF Seal Machine, and to determine whether the lead could be

washed down the drain.  Pl.'s App. Ex. P at 73.

On February 24, 2000, the Sony medical department inadvertently took a blood lead level

draw from Roth in connection with his annual physical examination.  J.S. ¶ 13.  Prior to February

24, 2000, Sony did not take blood lead levels of any of the glass technicians in the new glass

processing area.  Id. ¶ 18.  Sony also did not take any air samples in the new area to test the

amount of lead oxide in the air.  Id. ¶ 19; Def.'s App. Ex. D at 57.[9]  Ramer stated that Sony did

not initially monitor the air in the PF seal area because although "there was the ability to liberate

lead from sealing, . . . the information available never indicated that it could be at a quantity

during liberation that would be considered hazardous or close to hazardous.  It was an

accumulation condition."  Def.'s App. Ex. D at 57.[10]  Roth's blood lead level measured

44µg/100g – 4µg/100g above the threshold limit set by OSHA 40µg/100g.  Id.  Following a

second test on February 28, 2000, Roth's blood lead level measured 45µg/100g.  After this

second elevated measurement, Sony arranged to test the blood lead levels of the remaining three

---

[9]  Lead oxide levels measure at the AGS operation in 1998 were below the OSHA action
level.  Id. ¶ 4. Sony contends that, based upon the information it had from the AGS operation, it
"assumed" that the PF Seal Machine would not produce lead oxide levels above OSHA limits.
Id. ¶ 6.  OSHA regulations, however, require employers to make an initial determination whether
"any employee may be exposed to lead at or above the action level."  29 C.F.R. §
1910.1025(d)(2).

[10]  Ramer stated that lead exposure could result from the disturbance of a large quantity of
accumulated lead residue.  Pl.'s App. Ex. P at 58.

technicians in the area, including Buss and Shetterly.  Id. ¶ 14.[11]  Shetterly's test revealed a blood

lead level of 49μg/100g, and Buss had a blood lead level of 34μg/100g.  Id. ¶¶ 15-16.

Following the positive test results in March 2000, the glass processing area was shut

down for approximately one month.  J.S. ¶ 21.  During this time period, Sony instituted a medical

surveillance program in accordance with OSHA regulations.  See 29 C.F.R. § 1910.1025(j).

Sony also contends that it "implemented a rigorous testing protocol to monitor the lead levels

and determine the effectiveness of remediation."  J.S. ¶ 21.  Sony took personal air samples of

the technicians, notified the technicians of the results, and continued to monitor blood lead levels

of the technicians in the glass processing area.  Id.  On April 1, 2000, Sony restarted the glass

processing unit.  Id. ¶ 22.  Shetterly's blood lead level rose to a high of 82.5μg/100g on April 3,

2000, and remained above 40 μg/100g throughout the course of April 2000.  Barceloux Ex. Rep.

of Shetterly Table 1.[12]  Shetterly was prescribed chelation therapy between April 24, 2000 - May

12, 2000.  Id.  On April 28, 2000, Shetterly's blood lead level dropped to 22μg/100g.  Id.

Shetterly's blood lead level remained below 40μg/100g (with a high measured at 23.3μg/100g on

December 17, 2000) until March 5, 2001, when it was measured at 54.3μg/100g.  Id.  After a

measurement of 47μg/100g on March 12, 2001, Shetterly's physician again placed him on

chelation therapy.  Id.[13]  After this second round of chelation, Shetterly's blood lead level did not

_____

[11]  The parties differ as to whether Sony immediately tested the other technicians following Roth's elevated measurements, or whether such tests were taken only after Roth requested the other technicians to be tested.  Roth contends that Sony initially informed him that the work site was not causing his elevated blood lead levels, and that it was the result of poor hygiene or lead at his home.  Pl.'s App. Ex. E at 150.

[12]  Specifically, Shetterly's blood lead level measured 82.5μg/100g on April 3, 2000; 82 μg/100g on April 4, 2000; 77.5μg/100g on April 10, 2000; 69μg/100g on April 11, 2000; and 59μg/100g on April 18, 2000.

[13]  Sony attributes the increase in Shetterly's blood lead level to poor hygiene.

measure over 10μg/100g through July 9, 2003.  Id.  In comparison, Buss's blood lead level rose slightly to 35.4μg/100g on March 10, 2000.  Barceloux Ex. Rep. of Buss Table 1.  Following that measurement, Buss' blood lead level did not exceed 27μg/100g through July 29, 2003.  Unlike Shetterly, Buss was never prescribed chelation therapy by his physician.

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED.R.CIV.P. 56(c).  A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986).  In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party.  Id. at 249.  The court may consider any material or evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment.  Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993) (citing WRIGHT AND MILLER, FEDERAL PRACTICE § 2721); Pollack v. City of Newark, 147 F.Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1956), cert.denied, 355 U.S. 964 (1956) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or *otherwise made admissible in evidence*.") (emphasis added).

*Analysis*

## I.   The exclusivity provision of the Pennsylvania Workmen's Compensation Act

The statutory scheme set forth in the Pennsylvania Workmen's Compensation Act (the "Act") provides that workers' compensation benefits shall be the exclusive remedy for all injuries suffered by employees in the workplace. Section 303 of the Act, which contains what commonly is referred to as the Act's "exclusivity provision," provides in relevant part as follows:

> (a) The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employees, his legal representative, husband or wife, parents, dependents, next of kin, or anyone otherwise entitled to damages in any action at law or otherwise on account of any injury or death . . . .

77 P.S. § 481(a).

In Poyser v. Newman & Co., Inc., 522 A.2d 548 (Pa. 1987), the Pennsylvania Supreme Court determined that the exclusivity provision of the Act barred the plaintiff from bringing an intentional tort claim against his employer in which the plaintiff alleged that the employer caused the plaintiff's injury by disregarding government safety regulations and deliberately exposing him to a known hazard. As part of his employment with the defendant, which was in the business of manufacturing, distributing, and selling pallets and skids, the plaintiff operated a "notching" machine. Id. at 550. The machine, designed and manufactured by the defendant, contained six sharp saw blades that spun when the machine was activated. Id. The plaintiff's complaint alleged, inter alia, that the machine did not comply with applicable local, state and federal safety regulations. The plaintiff further alleged that because of the non-compliance, he was directed to remove the machine the evening before a known OSHA inspection took place. According to the plaintiff, the machine was removed prior to the OSHA inspection (which occurred eleven days prior to his injury) and returned to the site immediately thereafter. Id.

Plaintiff alleged that action on behalf of the defendant "amounted to a deliberate and wanton disregard for the safety of its workers, and such was the cause of the appellant's injury." Id. The Pennsylvania Supreme Court, surveying the language of the statute and applicable legislative history, concluded that the General Assembly considered but rejected an exception to section 301(a) for intentionally caused harm. Id. at 551. As a result, the court concluded that the plaintiff's claim for the intentional tort of fraudulent concealment was properly dismissed.[14]

In Martin v. Lancaster Battery Co., 606 A.2d 444 (Pa. 1992), however, the Pennsylvania Supreme Court recognized a narrow exception to the exclusivity provision where the defendant was aware of an injury to the plaintiff, the defendant failed to disclose that injury to the plaintiff, and the plaintiff's injuries were aggravated as a result of the defendant's intentional non-disclosure. The plaintiff in Martin was employed by Lancaster Battery Company ("LBC"), a manufacturer of automotive batteries. Id. at 445. The manufacturing process for the batteries exposed employees to lead dust and fumes. Federal safety regulations required LBC to test its employees for lead content on a regular basis. LBC's manager oversaw the blood testing of LBC employees at the facility. Over a period of 30 months, the defendant's manager intentionally withheld and intentionally altered blood test results from the plaintiff. The plaintiff's lead exposure eventually caused him to be diagnosed with chronic lead toxicity, lead neuropathy, hypertension, gout, and renal insufficiency. The plaintiff alleged that his "condition would have been substantially reduced if his employer had not perpetrated a delay by failing to accurately report the elevated levels of blood in Mr. Martin's blood." Id. at 446. The defendant filed

---

[14] The Pennsylvania Supreme Court reached a similar result in Barber v. Pittsburgh Corning Corp., 555 A.2d 766 (Pa. 1989). In that decision, the court held that there was no exception to the exclusivity provision of the Occupational Disease Act ("ODA") for injuries to employees caused by the alleged intentional misconduct of their employer.

preliminary objections in the nature of a demurrer, arguing that the plaintiff's claims were barred by the exclusivity provision of the Act. The trial court sustained the objections and dismissed the complaint. On appeal, the Pennsylvania Superior Court reversed, holding that the exclusivity provision did not bar the plaintiff's claim for fraudulent misrepresentation. The Pennsylvania Supreme Court distinguished its holding in <u>Poyser</u> on the basis that "the fraudulent misrepresentation in <u>Poyser</u> was made to a third party and was *not* made to the injured employee." <u>Id</u>. at 447 (emphasis in original). In addition, the court noted that the claim in <u>Poyser</u> was not based upon the "*aggravation*" of a work-related injury. <u>Id</u>. (emphasis in original).

Under the circumstances set forth in <u>Martin</u>, an employee can recover outside of the Act's exclusivity provision if he can prove: (1) the employer made a fraudulent misrepresentation, and (2) the misrepresentation caused the aggravation of a work-related injury. <u>Id</u>. at 448. Under those circumstances, a plaintiff is not barred by the exclusivity provision of the Act because he or she is not seeking relief for a work-related injury itself, but rather seeks relief for the aggravation of the injury based upon the employer's fraudulent misrepresentations. <u>Id</u>.

## II.     The <u>Martin</u> factors applied to plaintiffs

### A.     Fraudulent misrepresentation

The first <u>Martin</u> factor requires the court to examine whether defendant made a fraudulent misrepresentation to plaintiffs. Generally, a party alleging a fraudulent misrepresentation must prove the following elements under Pennsylvania law: (1) a representation; (2) the materiality of the representation to the transaction at hand; (3) that the representation was made falsely, with knowledge of its falsity or recklessness as to whether it is

13

true or false; (4) that the representation was made with the intent of misleading another into

relying on it (scienter); (5) justifiable reliance on the misrepresentation; and (6) that the resulting

injury was proximately caused by the reliance.  Bortz v. Noon, 729 A.2d 555, 560 (Pa. 1999)

(citing RESTATEMENT (SECOND) OF TORTS § 525).  In this case, the court finds that plaintiffs

presented sufficient evidence to raise a genuine issue of material fact with respect to whether

defendant fraudulently misrepresented that the lead oxide in the processing area was not harmful

to plaintiffs.

The record reveals defendant was aware that: (1) the glass pieces involved in the PF seal

process contained lead; and (2) lead oxide was created as a by-product of the PF seal process.

Plant engineers discussed the existence of lead powder on the PF Seal Machine as early as June

1999.  Five technicians, including plaintiffs, worked within the area of the PF Seal Machine.

Each of these technicians noticed a powdery substance that was caked on the PF Seal Machine,

and each, at varying points, asked either Stabley, Ramer, or Tamura about the substance.  The

deposition testimony of each of the technicians was consistent: Sony supervisors informed them

that the substance was not dangerous.  Specifically, Ramer, Sony's Health and Safety

Administrator, told both Shetterly and Buss that the substance was not harmful.

In September-October 1999, the evidence of record reflects that Shetterly complained to

Ramer that he was experiencing nausea, leg cramps, cramps and a metallic taste in his mouth.

Similarly, Buss reported having muscle cramps, nausea, and a metallic taste in his mouth.

Ramer, who was aware of the symptoms of lead toxicity by virtue of his education and training,

attributed plaintiffs' symptoms to the heat within the processing unit.  Ramer testified at his

deposition that the symptoms of heat and lead toxicity are similar, but that lead toxicity is

distinguished by the existence of a metallic tasted in the mouth.  Even after plaintiffs became

aware that lead existed in the processing area when they were required to use D-lead to clean the machine, Ramer reassured plaintiffs that there was an insufficient amount of lead in the area to harm plaintiffs.  In this respect, the statements made by Sony's agents were material representations relating to the issue of whether the lead oxide in the processing area was harmful.

The evidence further raises an issue of material fact as to whether the statements made by Ramer were false with the intent of misleading plaintiffs to rely upon them.  Defendant contends that Ramer was not a doctor, and that, even if he was, he could not have been able to make a lead toxicity diagnosis without the benefit of a blood lead level test.  Therein, however, lies a fundamental problem.  It is undisputed that defendant failed to follow OSHA regulations and make an initial determination of its employees' exposure to lead in the PF Seal Machine area. See 29 C.F.R. § 1910.1025(d).  The regulation's applicable subsection provides for the following if a positive initial determination is made:

> (4) Positive initial determination and initial monitoring.
> (i) Where a determination conducted under paragraphs (d)(2) and (3) of this section shows the possibility of any employee exposure at or above the action level, the employer shall conduct monitoring which is representative of the exposure for each employee in the workplace who is exposed to lead.
> (ii) Measurements of airborne lead made in the preceding 12 months may be used to satisfy this requirement if the sampling and analytical methods used meet the accuracy and confidence levels of paragraph (d)(9) of this section.

29 C.F.R. § 1910.1025(d)(4).  Because Sony did not comply with the regulations, it is unclear whether plaintiffs in the initial determination would have tested positive and prompted the initial monitoring of all the technicians in the processing area.  The evidence of record reflects, however, that plaintiffs were told that the lead oxide was not harmful despite the fact that defendant was unaware if such statements were true because it failed to comply with a federal safety regulation.

15

In addition, there is evidence in the record that: (1) Ramer was concerned that adverse health conditions could result if the accumulation of lead oxide in the processing area was disturbed; and (2) the cleaning regiment of the PF Seal Machine directed by Ramer and Stabley caused an accumulation of a large dust cloud to filter outside the processing area.  Pl.'s App. Ex. P at 58; Ex. D at 166-67.[15]  Furthermore, there is evidence that Sony was driven by production numbers, and that Sony was behind on its production schedule in the new processing area due to the large number (approximately 80%) of bulbs that were breaking in the initial production stage.

Under Pennsylvania law, the scienter requirement can be met by producing evidence that the alleged fraudulent misrepresentation was made by a defendant "knowing it to be false, or with such conscious ignorance of its truth, as to be equivalent to a falsehood."  Aiello v. Ed Saxe Real Estate, Inc., 499 A.2d 282 (Pa. 1985) (quoting Griswold v. Gebbie, 17 A. 73 (1889)).[16]  In this case, it is a material issue of fact whether the statements made by Sony personnel regarding the safety of the conditions in the processing area were false statements made with the intent to mislead plaintiffs because of production problems.  There is evidence of record that Sony was unaware if the lead in the processing area was dangerous because it failed to follow a federal regulation to test initially the area.  In addition, although Sony was aware that lead oxide dispersed in large amounts in the processing area could be harmful, the evidence of record

---

[15]  Stabley was so concerned about lead being washed off of the hoods of the PF Seal Machine that he contacted the plant maintenance department to determine whether the maintenance department would be able to treat the lead by-product being washed down the drain. Pl.'s App. Ex. D at 161-62.

[16]  In this respect, the court disagrees with defendant that "actual knowledge" is always a requirement in fraudulent misrepresentation cases.  As the decisions cited above recognize, the falsity and scienter prongs of the fraudulent misrepresentation tort may be met without "actual knowledge" if the statement is made with "conscious ignorance of its truth, as to be equivalent to a falsehood."  Id.

reflects that Sony personnel informed plaintiffs "not to worry" when large dust clouds of lead oxide formed when the PF Seal Machine was cleaned. For both of these reasons, it is a jury question as to whether Sony at the very least recklessly misled plaintiffs that the lead oxide was not dangerous in order to maintain its production schedule in the new processing area.

Finally, the court finds that there is a material issue of fact as to whether plaintiffs justifiably relied upon defendant's alleged misrepresentations. Based upon the record before the court a jury could conclude that plaintiffs did not undertake any preventative measures beyond wearing paper masks that apparently do not protect against the inhalation of lead oxide particles. In addition, a jury could conclude that plaintiffs did not seek testing or medical treatment for lead exposure, mainly because they were told by defendant that the lead oxide was not harmful. As a result, the court finds that the evidence is sufficient to raise a genuine issue of material fact that plaintiffs justifiably relied upon the alleged misrepresentations to their detriment.

### C.   The employer's alleged fraudulent misrepresentation causes the employee's injury to be aggravated

The second <u>Martin</u> factor requires plaintiffs to produce sufficient evidence that defendant's alleged fraudulent misrepresentation caused the aggravation of a work-related injury. As stated above, to succeed with respect to this factor, each plaintiff must demonstrate that the aggravation "arises from and is directly related to the employer's fraudulent misrepresentation." <u>Martin</u>, 606 A.2d at 448. Thus, a <u>Martin</u> claim cannot succeed unless the employee produces evidence that a work-related injury was aggravated *because of* the employer's fraudulent misrepresentation. Because this second factor of the <u>Martin</u> test requires the court to examine whether the employee produced sufficient evidence to create a genuine issue of material fact that

the fraudulent misrepresentation caused an aggravation of the employee's injury, the court will separately review the causation evidence produced by each plaintiff.[17]

### 1.    Buss did not produce sufficient evidence regarding whether he suffered a compensable injury as a result of his lead exposure

Prior to examining whether Buss produced sufficient evidence that defendant's alleged fraudulent misrepresentation aggravated a pre-existing injury, Buss must first produce sufficient evidence that a pre-existing injury actually existed.  In this regard, the court is compelled to examine the evidence that Buss argues proves he suffered a compensable injury as a result of his lead exposure.

Buss' experts, Drs. Herbert Needleman and Jay Harper, each stated in their expert reports that Buss has experienced a slowing of the motor nerve conduction velocities ("MNCV") in his upper extremities.  Pl.'s Initial Expert Reports (Doc. No. 50), Ex. A at 2; Ex. B at 5.  Defendant's expert, Dr. Donald G. Barceleoux, agreed that "[p]eripheral motor neuropathy (e.g. wrist drop) is the classic neurological effect of chronic lead toxicity characterized by segmental demyelination and axonal degeneration producing extensor muscle palsy (wrist and ankle weakness)."

---

[17]  The court disputes plaintiffs' assertion that "the Court has already decided that Plaintiffs may proceed with their case on causation."  Pl.'s Br. in Opp. (Doc. No. 120) at 19.  In a Daubert hearing, district courts perform a "gatekeeper" function with respect to the admissibility of expert testimony.  This function requires the court to make certain that "evidence presented by expert witnesses is relevant, reliable, and helpful to the jury's evaluation of such evidence."  Elcock v. Kmart Corp., 233 F.3d 734, 744 (2000) (citing  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597).  At the outset, the district court must determine whether an expert is proposing to testify to scientific or other specialized knowledge that will assist the trier of fact to determine a fact in issue.  Daubert, 509 U.S. at 592; see also Kuhmo Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999).  The court in a Daubert hearing, thus, determines the admissibility of expert evidence, not whether such evidence is sufficient with respect to a matter upon which the plaintiff has the burden of proof.  Plaintiff's argument does not recognize this fundamental difference.  Accordingly, the court will proceed to examine the expert evidence offered in support of each plaintiff regarding causation.

Barceleoux Ex. Rep. at 19.[18]   In addition, Dr. Harper indicated that Buss's blood lead level and

---

[18]   The court will grant plaintiff's motion to strike Dr. Donald G. Barceloux's affidavit (Doc. No. 110).  Dr. Barceloux's affidavit does not comply with Rule 56(e) of the Federal Rules of Civil Procedure, which provides in relevant part as follows:

> *Supporting* and opposing *affidavits* shall be made on personal knowledge, *shall set forth such facts as would be admissible in evidence*, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

FED.R.CIV.P 56(e) (emphasis added).  The requirements set forth in Rule 56(e) are mandatory, and "ultimate or conclusory facts and conclusions of law, as well as statements made on belief or 'on information and belief,' cannot be utilized on a summary judgment motion." 10B C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE & PROCEDURE § 2738 (1998); see Olympic Junior, Inc. v. David Crystal, Inc., 463 F.2d 1141, 1146 (3d Cir. 1972) (conclusory statements insufficient in an affidavit supporting summary judgment). Dr. Barceloux's affidavit contains the following three averments:

1. I am a licensed medical doctor, certified in emergency medicine with a subspecialty certification and re-certification in medical toxicology.  A true and correct copy of my Curriculum Vitae is attached hereto as Exhibit A.

2. The diagnosis of lead toxicity requires more than a set of symptoms or the presence of lead oxide in the workplace because the signs and symptoms of lead toxicity are non-specific.  Consequently, the diagnosis of lead toxicity depends on a blood lead level as well as a history and physical examination to exclude other causes of the non-specific symptoms associated with lead toxicity.

3. The symptoms of headache, nausea, muscle cramps, back pain, and leg pains are subjective, non-specific symptoms that I see daily in the Emergency Department.  There are many causes for these symptoms, including a viral infection, heat exhaustion, musculoskeletal trauma, and heavy physical exertion.  Taken together these symptoms by themselves do not suggest lead toxicity, and lead toxicity is usually not part of the differential diagnosis for these symptoms.

Barceloux Aff. at ¶¶ 1-3.

The affidavit at issue is characterized by the total absence of any facts relating to the matters in dispute.  Rather, it sets forth conclusory statements regarding lead toxicity that have no attachment to facts in the record.  It is for this reason the court also finds that Dr. Barceloux's evidence should be excluded because it is not admissible evidence.  In this respect, Rule 56(e) intersects with Federal Rule of Evidence 401.  The averments contained in the Barceloux affidavit are not relevant because there is no foundation supporting Barceloux's sweeping conclusions.  For example, in paragraph 3 of the affidavit, Barceloux makes a broad statement regarding certain "non-specific" symptoms that he sees "daily in the Emergency Department." Id. ¶ 3.  That may well be the case; however, without any connection to the known facts of the case, Barceloux's statement is not "evidence having any tendency to make the existence of *any fact that is of consequence to the determination of the action* more probable or less probable that it would be without the evidence." Fed.R.Evid 401 (emphasis added).  In this case, it is

his Zinc Protoporphorin ("ZPP") levels were elevated when they were tested in March 2000, although not above the OSHA action limit.  Def.'s App. Ex. H at 131.[19]  Dr. Needleman concluded in his expert report:

> The peripheral neuropathies displayed by Mr. Buss are characteristic of lead exposure in workers.  I believe to a reasonable medical certainty that *lead was the cause of his neuropathy* ant [sic] that earlier termination of exposure would have reduced the neurological deficits displayed by Mr. Buss.

Needleman Ex. Rep. at 2 (emphasis added).  Similarly, Dr. Harper opined: "[I]t is my opinion within a reasonable degree of medical certainty that Mr. Buss's *neuropatchic deficits* are due either totally, or, in part, to his *lead poisoning*."  Harper Ex. Rep. at 5 (emphasis added).

In order to prove ultimately that he has a compensable injury, however, Buss must demonstrate that the decreased MNCV / neuropatchic deficits in his upper extremities was accompanied by a physical impairment.  Simmons v. Pacor, Inc., 674 A.2d 232, 237 (Pa. 1996) (Pennsylvania Supreme Court determined that asymptomatic pleural thickening of the lungs resulting from asbestos exposure was not a compensable injury giving rise to a cause of action); see also Howell v. Celotex, 904 F.2d 3 (3d Cir. 1990) (predicting the result eventually adopted by the Pennsylvania Supreme Court in Simmons) .  Based upon the evidence before the court, Buss cannot overcome this hurdle.

---

undisputed that plaintiffs worked in an area that was known to produce lead oxide; thus, there may or may not be a distinction between a general member of the public reporting to an emergency room with those symptoms and an employee who worked daily around lead oxide. Because there is no foundation in the Barceloux affidavit related to the factual background, the court finds that the conclusions in the affidavit would not be admissible into evidence. Accordingly, the court will grant plaintiff's motion to strike the affidavit (Doc. No. 110). Whether Dr. Barceloux may testify at trial if defense counsel lays a proper foundation is an issue that is not before the court at this time.

[19]  Buss's blood lead level and ZPP level are currently not elevated.

In October 1999, Buss complained for the first time that he had headaches, muscle cramps, nausea, and a metallic taste in his mouth.  Pl.'s App. Ex. E at 82-83; Pl.'s Supp. Aff. ¶¶ 4-5.  Dr. Harper additionally testified that Buss had symptoms of occasional headaches, decreased coordination, lethargy, problems with short-term memory, nausea, and muscle cramps in his arms and legs.  Def.'s App. Ex. H at 131-32.  As defendant correctly points out, however, there is no evidence linking Buss's decreased MNCV in his *upper extremities* to any of his alleged lead-based symptoms.  The only possible physical injury that could suffice to support Buss's claim under <u>Simmons</u> would be the muscle cramps in Buss's upper extremities.  Dr. Harper, however, testified at his deposition that the cramping in Buss's right thumb was attributed to Tenosynovitis – a musculoskelatal disorder unrelated to any nerve-related impairment.  <u>Id</u>. at 132.  As a result, the court concludes that Buss failed to produce sufficient evidence to demonstrate that his symptoms were the result of a lead-based injury.  Accordingly, the court will grant defendant's motion for summary judgment as to plaintiff Buss.[20]

**2.      Shetterly produced sufficient evidence to create a material issue of fact that he suffered a compensable injury as a result of his exposure to lead, and that his injury was aggravated by defendant's alleged fraudulent misrepresentation**

In contrast to Buss, the court finds that Shetterly produced sufficient evidence to create a material issue of fact that he suffered a compensable injury as a result of his exposure to lead in

---

[20]  The court will grant defendant's motion for summary judgment without prejudice to Buss so that Buss may file a complaint if a compensable injury develops in the future.  <u>See</u> <u>Quate v. American Standard, Inc.</u>, 818 A.2d 510, 514 (Pa. Super. Ct. 2003) (Pennsylvania Superior Court upheld entry of summary judgment and dismissal of the plaintiff's complaint without prejudice where the plaintiff, who was suffering from multiple ailments including asbestosis, could not establish a causal link between his symptoms and asbestos exposure).  Because the loss of consortium claim brought by Buss's wife, Judith Fleehr, is derivative to Buss's claim, that claim will also be dismissed without prejudice.

the plant.  Shetterly's blood lead level was the highest of the technicians in the glass processing

area.  Shetterly's initial blood test revealed a blood lead level of 49μg/100g.  His blood lead

level rose to a high of 82.5μg/100g on April 3, 2000, and it remained above 40μg/100g

throughout the course of April 2000.  Barceloux Ex. Rep. (Shetterly) Table 1.[21]  The elevated

blood lead level readings prompted Shetterly's medical toxicologist to prescribe chelation

therapy between April 24, 2000, and May 12, 2000.  Id.[22]  As stated above, Shetterly's blood lead

level to 22μg/100g on April 28, 2000, and remained below 40μg/100g until it was measured at

54.3μg/100g on March 5, 2001.  Id.  Nearly a year later, and despite the precautions and

preventative measures taken by Sony, Shetterly's blood lead level was again measured at an

elevated level of 47μg/100g.  This reading prompted Shetterly's physician to again place him on

chelation therapy; Shetterly's blood lead level did not measure above 10μg/100g thereafter.

Shetterly's symptoms at the time he was first exposed to lead oxide in the glass processing area

included: headaches, nausea, vomiting, muscle cramping and spasms, abdominal/flank pain,

moodiness, short-term memory problems, and a metallic taste in his mouth.  Pl.'s Supp. App. at

71-72.  In addition, a sperm sample taken in March 2000 revealed that Shetterly had a sperm

count below normal.  Barceleoux Ex. Rep. at 18; Harper Ex. Rep. at 4.  At his deposition in

November 2002, Shetterly complained of continuing muscle cramps, flank pain, stomach pain,

and pain in his right arm and leg.  Barceleoux Ex. Rep (Shetterly) at 11.  Furthermore, Shetterly

---

[21]  According to defendant's expert, Dr. Donald G. Barceloux, the most useful method for monitoring the absorption of lead by workers is the whole blood lead level.  Barceloux Ex. Rep. (Shetterly) at 4.

[22]  Both Shetterly's primary care physician, Dr. Jabbour, and his toxicologist, Dr. Ahktar, diagnosed Shetterly with lead toxicity as a result of his exposure to lead within the processing unit.  Barceleoux Ex. Rep. at 19.

was still excreting elevated amounts of lead in his urine in February 2003.  Needleman Ex. Rep.

at 2.

Defendant argues that Shetterly cannot prove that his symptoms were caused by lead

exposure because he had pre-existing injuries from several accidents.  In 1993, Shetterly was in a

motor vehicle accident which resulted in a close head injury and a knee injury.  J.S. ¶ 27.

Following the accident, Shetterly complained of the following symptoms: loss of bladder control,

severe migraine headaches, personality and emotional problems, problems with memory and

concentration, and knee problems requiring surgery.  Id.  Shetterly remains on medication for the

headaches, for seizure prevention, and emotional problems.  Id. ¶ 28.  In 1994, Shetterly had

carpal tunnel surgery.  J.S. ¶ 29.  Shetterly was involved in three motor vehicle accidents:  1996

(knee and foot injury), 1998 (knee and back injury), and February 2004 (cervical disc / shoulder

injury).  Id. ¶ 31.  In addition, Shetterly was injured in April 2002 (hearing loss, foot and ankle

injury) when his truck exploded while parked unattended in his driveway.  Id. ¶ 32.

The court agrees with Shetterly, that there is a genuine issue of material fact.  For

example, Dr. Harper testified in his deposition that Shetterly's headaches and emotional

problems attributable to the 1993 accident were stable prior to the time he began working in the

processing area in July 1999, and that they reemerged following his exposure.  Pl.'s App. Ex. Q

at 164-65.  Dr. Harper concluded the following:

> [I]t is my opinion within a reasonable degree of medical certainty that Mr.
> Shetterly's symptoms of cramps, muscle spasms, headache, memory difficulties
> and nausea were either caused or exacerbated by the lead exposure during the
> period from September 1999 through March 2000.  There was evidence of pre-
> existing headaches and renal stones (causing flank pain).  However, Mr. Shetterly
> had worsening of his headaches after the lead exposure and significant abdominal
> pain, which was not completely explained by his urologic work-up.  Thus, some
> of his symptoms of cramps/spasms/nausea may also be due to medical conditions
> other than lead poisoning, but it is likely that these were, in part, due to his lead
> exposure.  I do not believe that he has current peripheral nerve deficits from this

23

> exposure, but again, he may have likely had nervous system involvement from
> lead previously.  The change from abnormal nerve conduction studies to a normal
> study in September of 2002 suggest that a change such as decreased effects from
> lead over time have occurred.

Harper Ex. Rep. at 5.  In addition, plaintiff's expert Dr. Needleman rendered the following expert

opinion:

> In summary, this 32 year-old male was exposed to high levels of lead on the job,
> had a peak blood level of 82μg/dl, required two chelations, and continued to
> excrete elevated amounts of lead in his urine at the last time it was measured in
> February 2003.  He showed signs of encephalopathy, headache, muscle cramps
> and weakness, and hypospermia, a characteristic effect of lead exposure.  His
> exposure began in July of 1999 and continued until March of 2001.  I believe to a
> reasonable degree of medical certainty that his symptoms are a product of his lead
> exposure, and if this exposure had been terminated earlier, they would be less
> severe.

Needleman Ex. Rep. at 2.  Based upon plaintiff's symptoms and the expert opinions presented by

plaintiff, the court finds that plaintiff provided sufficient evidence to create a jury question on the

issue of whether he suffered a compensable injury caused by his exposure to lead in the

processing area.

In addition, the court finds that there is sufficient evidence to create a genuine issue of

material fact as to whether Shetterly's injuries were aggravated by defendant's alleged fraudulent

misrepresentation.  Defendant argues that plaintiff's own expert, Dr. Harper, testified that he

cannot render an opinion as to the date Shetterly first had an elevated blood level.  In his

deposition, Dr. Harper estimated that Shetterly's blood lead level was elevated above the OSHA

threshold, at the earliest, in November 1999.  Def.'s Ex. H at 130.  In a follow-up question from

Shetterly's counsel, however, Dr. Harper stated that Shetterly may have been exposed to lead

prior to November 1999.  Dr. Harper testified that he was limited to making a specific

determination as to the aggravation of the plaintiff's injury because defendant did not perform a

baseline examination as required by OSHA regulations.  Pl.'s App. Ex. Q at 158-59.  As a result, Dr. Harper stated he was constrained to provide only a general opinion, to a degree of medical certainty, that the plaintiff's injury was aggravated.  Id. at 159.[23]

The court finds that Dr. Harper's testimony is the only reasonable method plaintiff has to prove liability and damages regarding the aggravation of his alleged injury because of defendant's failure to comply with OSHA regulations once operations began in the glass processing area.  See Western Show Co., Inc. v. Mix, 173 A. 183, 184 (Pa. 1934).  In Mix, popular wild west actor Tom Mix breached his contract to perform in the plaintiff's circus for $10,000 per week.  The trial court permitted the plaintiff to prove its damages through expert testimony that estimated the probable decrease in the attendance at the circus because of Mix's absence.  The expert witnesses were "familiar with the extent to which defendant was a drawing attraction, [and] . . . were well acquainted with the character of plaintiff's business and of the place or places where it was carried on."  Mix,  173 A. at 184.  On appeal, the Pennsylvania

―――――――――――――――

[23] As Dr. Harper testified regarding his general opinion:

I don't know what the levels were.  I don't know any levels previous to March of 2000 so you don't know what the maximum may have been.  The maximum blood level, you can try to get that from looking at ZPP levels, but, again, you're limited to just going back in history as far as they will allow you to go back.  The other part of that that would have been helpful is if there would have been a baseline evaluation, and when I said they weren't done, there was not a physical done with information per OSHA standard.  By doing a complete history, physical and probably some lab work right at the beginning of the exposure to lead would have let you know what their baseline levels were and specific kind of questions that would need to be asked about lead, so questions about underlying neuropsychological problems would have been addressed right at that time period, and you can see how they progressed from there.  That wasn't done so we had no snapshot of what things were like when they first were exposed to lead.

Pl.'s App. Ex. Q at 159-60.

Supreme Court affirmed the decision of the trial court.  The court held that the expert testimony as to the probable decrease in attendance, although "unsatisfactory in character," was the only "reasonable way open to plaintiff to prove the substantial damages it had suffered."  Id. Similarly, in this case, the only way that plaintiff can prove: (1) that there was an aggravation of his injury following the alleged fraudulent misrepresentation; and (2) the extent of damages resulting from the misrepresentation, is through the introduction of expert testimony.  Because of defendant's own failure to follow OSHA regulations and establish a baseline of Shetterly's blood lead level when he began working in the glass processing area, defendant cannot now object to the sufficiency of Dr. Harper's testimony.  Shetterly's expert evidence as to the aggravation of his injury may be "unsatisfactory in character" like the evidence received in Mix.  Based upon the facts set forth in this case, however, aggravation cannot be concretely measured because of defendant's own conduct.  As a result, the court finds that Shetterly presented sufficient evidence that defendant's alleged false misrepresentation aggravated Shetterly's injury.[24]

### Conclusion

**AND NOW** this 13th day of September 2005, after consideration of the motions filed by defendant and the responses filed by plaintiffs, the court enters the following order:

• Defendant's motion for summary judgment with respect to plaintiffs Shawn Shetterly and Bobbi Jo Shetterly (Doc. No. 97) is **DENIED.**

• Defendant's motion for summary judgment with respect to plaintiffs Aryln Buss and Judith B. Fleehr (Doc. No. 108) is **GRANTED**.  **IT IS HEREBY ORDERED,**

---

[24]  Because plaintiff Bobbi Jo Shetterly's loss of consortium claim is derivative to plaintiff Shawn Shetterly's claim, defendant's motion for summary judgment will also be denied with respect to Bobbi Jo Shetterly.

**ADJUDGED, and DECREED THAT JUDGMENT IS ENTERED** in favor of Defendant Sony Electronics, Inc., and against Plaintiffs Arlyn Buss and Judith B. Fleehr on all claims asserted by plaintiffs Buss and Fleehr in their complaint.  The claims of Arlyn Buss and Judith B. Fleehr shall be dismissed without prejudice in accordance with Quate v. American Standard, Inc., 818 A.2d 510, 514 (Pa. Super. Ct. 2003).

•    Plaintiff's motion to strike (Doc. No. 110) is **GRANTED**.

•    Defendant's motion to strike (Doc. No. 128) is **DENIED**.

By the court:


/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge


cc:      Counsel of Record